1
2
3
4
5
6
7
8              **UNITED STATES DISTRICT COURT**

9              **EASTERN DISTRICT OF CALIFORNIA**

10

11   MARIANELA LEON ESPINOZA;              Case No. 1:25-CV-01101 JLT SKO
     MAYRA MENDEZ; LORGIA
12   BOLAINEZ DIAZ; YURY VASQUEZ           AMENDED ORDER GRANTING
     PEREZ; AMMY VARGAS                    TEMPORARY RESTRAINING ORDER AND
13   BAQUEDANO; MARIELA RAMOS,             ORDER SETTING A HEARING ON THE
                                           PRELIMINARY INJUNCTION
14                      Petitioners,
                                           (Doc. 3)
15   v.

16   POLLY KAISER, et. al,

17                      Respondents.

18   I.      **INTRODUCTION**

19          The six Petitioners in this case are all female asylum seekers from Central and South

20   American nations who, after brief periods of detention following arrival in this country, were

21   released on their own recognizance into the United States. All of them were recently re-detained

22   without prior notice. Briefly, here are their stories:

23          <u>Marianela Leon Espinoza</u> is a 24-year-old native and citizen of Peru who entered the

24   United States without inspection on or about July 11, 2022. (Respondents' Appendix (RA), Doc.

25   11-1, 013 ¶¶ 4–5[1]). A few weeks later, on July 21, 2022, Marianela[2] was released on her own

26

27   ───────────────
     [1] For ease of reference, the Court will use the Bates numbers affixed to Respondents' Appendix when referencing
     documents therein.

28   [2] Because Petitioners refer to themselves by their first names in the Petition, the Court will do so as well.

1    recognizance. (*Id.*, ¶ 6 (referencing Form I-220A).) At some point, she applied for asylum. (Doc.

2    2, ¶ 6.) Before her re-arrest, Marianela lived in Oakland, California. (*Id.*) It is undisputed that she

3    has no criminal history. (*See id.*) On July 18, 2025, Marianela appeared for a Master Calendar

4    Hearing before the San Francisco Immigration Court. (*Id.*) At that hearing, U.S. Immigration and

5    Customs Enforcement (ICE) moved to dismiss her removal proceedings. (RA 013 ¶ 7.) The

6    Immigration Judge (IJ) did not rule on the motion and gave Marianela time to respond. (*Id.*) That

7    same day, ICE detained Marianela "because she was amenable to Expedited Removal pursuant to

8    section 235 of the Immigration and Nationality Act." (*Id.* ¶ 8 (cleaned up).) She is currently

9    detained at Mesa Verde ICE Processing Center in Bakersfield, California ("Mesa Verde"). (*Id.*, ¶

10   9.) Marianela is approximately two months pregnant. (Doc. 2, ¶ 6.) According to the Petition, she

11   is receiving no prenatal care. (*Id.*) Marianela's immigration court proceedings remain ongoing,

12   and she has an "individual" hearing to consider the merits of her asylum claim scheduled for

13   October 20, 2025. (*Id.*)

14        Mayra Mendez is a 44-year-old native and citizen of Belize who entered the United States

15   without inspection on or about January 8, 2024. (RA 002, ¶¶ 4–5; Doc. 1, ¶ 7.) She was initially

16   detained at a facility near the border, (Doc. 2, ¶ 7), but that same day, she was released on her

17   own recognizance. (RA at 2, ¶ 6.) She was issued a Notice to Appear in immigration court, where

18   presented an asylum application. (*See* Doc. 2, ¶ 7.) Before ICE re-arrested her, Mayra was living

19   in Redwood City, California providing caretaking services to elderly people. (*Id.*) She has no

20   criminal history and has attended all immigration court hearings. (*Id.*) On August 1, 2025, Mayra

21   appeared for a Master Calendar Hearing before the San Francisco Immigration Court. (*Id.*) At that

22   hearing, ICE moved to dismiss her removal proceedings. (RA 002, ¶ 7.) The IJ did not rule on the

23   motion and gave her time to respond. (*Id.*) That same day, ICE detained Mayra "because she was

24   amenable to Expedited Removal pursuant to section 235 of the Immigration and Nationality Act."

25   (*Id.* ¶ 8 (cleaned up).) She is currently detained at Mesa Verde. (*Id.*, ¶ 9.) Mayra's immigration

26   court proceedings remain ongoing, and she has a Master Calendar Hearing scheduled for

27   September 22, 2025. (Doc. 2, ¶ 7.)

28        Lorgia Bolainez Diaz is a 43-year-old citizen of Nicaragua who entered the United States

1    without inspection on or about March 19, 2024. (RA 005, ¶¶ 5–6). Upon entry, she was detained

2    for over a week at a facility near the border. (Doc. 2, ¶ 8.) Immigration authorities originally

3    issued an expedited removal order to Lorgia, but she expressed a fear of return to Nicaragua and

4    explained that she was seeking asylum. (*Id*.; RA 005, ¶¶ 7–8). Lorgia then had a credible fear

5    interview before an asylum officer, but the officer incorrectly asked Lorgia questions about her

6    fear of return to Mexico. (Doc. 2, ¶ 8.) Because of this error, an IJ later vacated Lorgia's

7    expedited removal order. (*Id*.; RA 005, ¶¶ 9.) On or about March 29, 2024, DHS issued Lorgia a

8    Notice to Appear in immigration court, where she could pursue her asylum application, and

9    released her on her own recognizance. (Doc. 2, ¶ 8; *see also* RA 010 (IJ order vacating negative

10    credible fear determination and providing "the applicant an opportunity to present their claim in

11    INA sec. 240 proceedings").) She timely filed an asylum petition on March 7, 2025. (RA 005,

12    ¶ 10.) Lorgia has no criminal history and has attended all immigration court hearings. (*Id*.) Before

13    ICE re-arrested Lorgia, she was living in Fresno, California. (*Id*.)

14         On or about August 6, 2025, Lorgia appeared as required to a scheduled check-in

15    appointment at ICE's Field Office in Fresno, where she was re-arrested. (*Id*.) On August 7, 2025,

16    she was issued a Notice to Appear in removal proceedings, (RA 006, ¶ 11), though the Court has

17    not been provided with a copy of that record. On August 13, 2025, Petitioner appeared before an

18    IJ, who denied Petitioner's oral request for release on bond, finding Petitioner is subject to

19    mandatory custody pursuant to INA § 235(b). (*Id*., ¶ 12.) On August 25, 2025, an IJ granted her

20    request for a for additional time to seek counsel. (*Id*., ¶ 13.) Her removal proceedings were reset

21    for September 22, 2025. (*Id*.) She remains detained Mesa Verde. (*Id*.)

22         Ammy Vargas Baquedano is a 32-year-old native of Nicaragua who entered the United

23    States without inspection on or about April 12, 2022. (Doc. 2 at ¶ 10; RA 019, ¶¶ 5–6.) That same

24    day, she was encountered by a Border Patrol Agent. (RA 019, ¶ 6.) Within a few days, Ammy

25    was released on her own recognizance and issued a Notice to Appear in immigration court, where

26    she filed an asylum application. (Doc. 2 at ¶ 10; RA 019, ¶ 7.) Before ICE re-arrested her, Ammy

27    was living in San Francisco, California. (Doc. 2 at ¶ 10.) She has no criminal history and has

28    attended all immigration court hearings. (*Id*.) On or about June 30, 2025, ICE re-arrested Ammy

1    after her Master Calendar Hearing at the San Francisco Immigration Court. (*Id.*; RA 019, ¶ 8.) On

2    August 25, 2025, an IJ found that Ammy was ineligible for bond because she was subject to

3    mandatory detention under INA § 235(b). (RA 019, ¶ 9; RA 0021 (IJ order finding lack of

4    jurisdiction under *Matter of Q. Li*).) Ammy remains detained at Mesa Verde. (RA 019, ¶ 10.)

5    Ammy's immigration court proceedings remain ongoing; as of the date of the filing of the

6    Petition, she had a Master Calendar Hearing set for September 8, 2025. (Doc. 2 at ¶ 10.)

7         Mariela Ramos is a 44-year-old native of Guatemala who entered the United States

8    without inspection on or about November 18, 2024, where she was encountered by a Border

9    Patrol Agent. (Doc. 2 at ¶ 11; RA 016, ¶¶ 4–5.) She was detained for a brief period and then, on

10    or about November 23, 2024, was released on her own recognizance. (Doc. 2 at ¶ 11; RA 016, ¶

11    6.) On or about December 9, 2024, a Supervisory Asylum Officer issued a Notice to Appear

12    following a Credible Fear Review. (RA 016, ¶ 7.) Mariela cannot read or write in any language,

13    and she struggles to remember events in the past. (Doc. 2 at ¶ 11.) To her knowledge, she has not

14    missed any required check-in or hearing. (*Id.*) On or about July 27, 2025, an ICE officer knocked

15    on Mariela's door at her home address and asked her to state her name. (*Id.*) When she did, the

16    officer placed her in handcuffs and took her into custody. (*Id.*) She was served with a Form I-200

17    (Warrant for Arrest of Alien). (RA 016, ¶ 8.) Mariela is now "mandatorily" detained at Mesa

18    Verde. (*Id.*, ¶ 9.) Her immigration court proceedings remain ongoing, and she has a Master

19    Calendar Hearing set for September 8, 2025. (Doc. 2 at ¶ 11.)

20         Yury Vasquez Perez is a 19-year-old citizen of Guatemala, who entered the United Stats

21    unlawfully on or about January 29, 2024, and thereafter was encountered by a Border Patrol

22    Agent. (Doc. 2 at ¶ 9; RA 024, ¶¶ 5–6.) She was detained for a few days and then released on her

23    own recognizance, with conditions, including reporting requirements. (RA 024, ¶ 7.) She was also

24    issued a Notice to Appear in immigration court, where she could pursue her asylum application.

25    (Doc. 2 at ¶ 9.) Before ICE re-arrested her, Yury was living in Eugene, Oregon. (*Id.*) She has no

26    criminal history. (*Id.*) According to ICE, on May 20, 2025, Yury failed to report for a scheduled

27    check in with Enforcement and Removal Operations (ERO) on May 20, 2025. (RA 024, ¶ 8.) On

28    or about June 3, 2025, Yury reported to a scheduled check-in appointment at the ICE Field Office

1    in Eugene, Oregon. (*Id.*) She provided an identification card issued by the State of Oregon which

2    listed a different address than the one she had provided ERO. (*Id.*) Based on her missed check-in

3    in May and ERO's belief that she was residing at a different address than the one provided, her

4    release on recognizance was "cancelled," she was issued a Form I-200, Warrant for Arrest of

5    Alien, and taken into ICE custody. (*Id.*) She is currently detained at Mesa Verde. (*Id.*) On July 28,

6    2025, an IJ found that Yury was not ineligible for bond because she was subject to mandatory

7    detention under INA 235(b)(2)(A). (*Id.*, ¶ 9; RA 026 (IJ order finding lack of jurisdiction under

8    *Matter of Q. Li*).) Yury's immigration court proceedings remain ongoing, and she has a Master

9    Calendar Hearing set for September 11, 2025. (Doc. 2 at ¶ 9.)

10            On August 29, 2025, Petitioners filed a joint petition for a writ of habeas corpus pursuant

11    to 28 U.S.C. § 2241, alleging that their detentions violate the Fifth Amendment's right to

12    substantive and procedural due process as well as the Fourth Amendment. (Doc. 2.) They have

13    also filed a request for a temporary restraining order that seeks the following relief: (1) immediate

14    release of all Petitioners from Respondents' custody without any intrusive electronic monitoring;

15    (2) an injunction barring Respondents from re-detaining them unless they provide 10 days' notice

16    and demonstrate at a pre-deprivation bond hearing, by clear and convincing evidence, that

17    Petitioners are a flight risk or danger to the community such that their physical custody is

18    required[3]; and (3) an injunction that prohibits the government from transferring Petitioners out of

19    this District and/or removing them from the country until these habeas proceedings have

20    concluded. (Doc. 3 at 12.)

21            Respondents have moved to sever the petitions from each other and to all but the first

22    named plaintiff from this lawsuit. (Doc. 10.) Respondents also oppose the petition on the merits,

23    maintaining all six Petitioners were "mandatorily" re-detained pursuant to 8 U.S.C. § 1225(b)(1).

24    (Doc. 11.)

25            For the reasons set forth below, the Court **GRANTS** the motion for a temporary

26    restraining order **IN FULL** as to all named Petitioners except for Your Vasquez Perez, and as to

27

28    ---
[3] Alternatively, Petitioners seek an injunction barring Respondents from re-detaining them absent further order of this Court. (Doc. 3 at 12.) The Court declines to consider this alternative form of relief.

her, the Court **GRANTS** the motion **IN PART.**

## II.    LEGAL BACKGROUND

### A.  Section 240 v. Expedited Removal Proceedings

Immigration law provides two main processes for removing noncitizens deemed ineligible to enter or remain in the United States. The first, commonly referred to as "Section 240" or "Section 1229a" proceedings, is the standard mechanism for removing inadmissible noncitizens. *See generally* 8 U.S.C. § 1299a. "Section 240 removal proceedings take place before an [Immigration Judge (IJ)], an employee of the Department of Justice (DOJ) who must be a licensed attorney and has a duty to develop the record in cases before them." *Coalition For Humane Immigrant Rights, v. Noem*, No. 25-CV-872 (JMC), 2025 WL 2192986, at *3 (D.D.C. Aug. 1, 2025)[4] (citing 8 U.S.C. § 1229a(a)(1), (b)(1) ("The immigration judge shall administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses.").)

> [Section 240 proceedings] are adversarial proceedings in which the noncitizen has the right to hire counsel, examine and present evidence, and cross-examine witnesses. 8 U.S.C. § 1229a(b)(4). The hearings are recorded, and a transcript is made available if a party appeals the decision. *Id.* § 1229a(b)(4)(C). A section 240 proceeding typically takes place over the course of multiple hearings due to the built-in procedures. This allows time for noncitizens to both gather evidence in support of petitions for relief available in immigration court (like asylum and certain adjustments of status) and seek collateral relief from other components of DHS (like adjustment of status on the basis of marriage or family). Upon a decision by the IJ, either party may appeal to the Board of Immigration Appeals (BIA). 8 C.F.R. §§ 1240.15, 1003.1. If the BIA upholds a removal order, the noncitizen may then appeal that decision to a U.S. court of appeals. 8 U.S.C. § 1252.

*Coalition*, 2025 WL 2192986, at *3 (internal record citations omitted).

Alternatively, an immigrant may be placed in "expedited removal" status for various reasons, including that the person entered the United States without a valid visa or other valid entry documents. *See generally* 8 U.S.C. § 1225. In expedited removal, the process is overseen by an immigration officer, rather than an IJ. 8 C.F.R. § 235.3(b)(2)(i). The officer asks the immigrant

---

[4] This ruling has been appealed to the D.C. Circuit, *Coalition for Humane Immigrant Rights, et al v. Kristi Noem*, et al, 25-5289 (D.C. Cir.), though it appears that the stay ordered by *Coalition* remains in place. Petitioner's arrest here occurred despite the stay ordered in *Coalition.*

1    questions about their "identity, alienage, and inadmissibility," and whether they intend to apply

2    for asylum, fear persecution or torture, or fear returning to their country of origin.

3    § 235.3(b)(2)(i), (b)(4). Noncitizens are not entitled to counsel during this questioning, and no

4    recording or transcript is made. 8 C.F.R. § 235.3(b)(2)(i).

5            Under the expedited removal process, if the immigrant claims asylum, fear of persecution

6    or torture, or a fear of returning to his or her country, "the inspecting officer shall not proceed

7    further with removal of the alien until the alien has been referred for an interview by an asylum

8    officer in accordance with 8 CFR 208.30." § 253.3(b)(4). Once the referral happens, the referring

9    officer must provide the immigrant with a written disclosure (Form M-444), which describes the

10    credible fear interview, including,

11            (A) The purpose of the referral and description of the credible fear interview
        process;
12            (B) The right to consult with other persons prior to the interview and any
        review thereof at no expense to the United States Government;
13            (C) The right to request a review by an immigration judge of the asylum
        officer'' credible fear determination; and
14            (D) The consequences of failure to establish a credible fear of persecution or
        torture.
15

16    § 253.3(b)(4)(i). The asylum officer then must interview the immigrant and determine if the

17    immigrant expressed a credible fear of persecution or torture. Whatever the officer's

18    determination, it must be reviewed by the supervisory asylum officer before it becomes effective.

19    8 C.F.R. § 208.30(3)(8). If there is a finding of credible fear, the case is converted to a § 240

20    proceeding[5] and set before an IJ. If the asylum officer and the supervisor determine that the

21    immigrant has not demonstrated a credible fear of persecution or torture, the immigrant may

22    request review by an IJ. § 208.30(g). Essentially, the IJ's determination is final. *Id*. Likewise,

23    habeas corpus review of the determinations made related to the expedited removal is limited. 8

24    U.S.C. § 1252(e)(2).

25            In *Coalition*, the District of Columbia District Court determined that under 8 U.S.C.

26    § 1225(b)(1)(A)(iii)(II), a person who has been paroled without first having been placed in

27

28    [5] Alternatively, the case may be moved into administrative asylum proceedings under § 208.30(f).

expedited removal <u>cannot be designated for expedited removal</u>. As *Coalition* explained:

> Noncitizens may be eligible for expedited, rather than section 240, removal only if they are inadmissible on the basis that they either lack proper entry documents or falsified or misrepresented their application for admission. 8 U.S.C. § 1225(b)(1)(A)(i); *see id*. § 1182(a)(6)(C), (a)(7) (grounds of inadmissibility). Among that set, only two categories of noncitizens are eligible for expedited removal: (1) noncitizens "arriving in the United States," and (2) noncitizens who "ha[ve] not been admitted or paroled into the United States" and cannot affirmatively show that they have been "physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility." 8 U.S.C. § 1225(b)(1)(A)(i)–(iii). The statute permits the Attorney General (who has since delegated this authority to the DHS Secretary) to designate the population of noncitizens within that second category who will be subject to expedited removal. And that designation lies within the Secretary's "sole and unreviewable discretion." *Id*. § 1225(b)(1)(A)(iii); *see* 8 C.F.R. § 235.3(b)(ii) . . .

2025 WL 2192986, *5 (footnote omitted). *Coalition* concluded that the statute "forbids the expedited removal of noncitizens who have been, at any point in time, paroled into the United States." 2025 WL 2192986, at *22.[6] *Coalition* at *22-*27 conducts an exhaustive analysis of 1225(b)(1)(A)(iii)/§ 235.3(b)(1), relevant directives, and case authority to come to its holding. *Coalition* holds that § 1225(b)(1)(A)(iii) "forbids the expedited removal of noncitizens who have been, at any point in time, paroled into the United States." 2025 WL 2192986, at *22.

Relatedly, the recent decision in *Make The Road New York* v. *Noem*, No. 25-CV-190 (JMC), 2025 WL 2494908 (D.D.C. Aug. 29, 2025), explicitly found that the petitioners in that case were likely to succeed on the merits of their claim that applying the expedited removal process set forth in 8 U.S.C. § 1225(b)(1) to noncitizens detained within the interior of the United States (i.e., in all locations not within 100 air miles of a <u>land</u> border) violates Due Process. Among other things, *Make the Road* found that the processes applicable to expedited removal under § 1225(b)(1), *see* 8 C.F.R. § 235.3, pose significant risks that individuals who are not statutorily eligible for expedited removal will nonetheless be subjected to it. 2025 WL 2494908 at

---

[6] *Coalition* also stayed several administrative actions undertaken by DHS, including one memorandum issued in January 2023 that directed relevant officials to "consider" placing in expedited removal "any alien DHS is aware of who is amenable to expedited removal but to whom expedited removal has not been applied," a process that "may include steps to terminate any ongoing removal proceeding and/or active parole status," as well as a separate February 2025 directive that ICE "consider" for expedited removal "paroled arriving aliens." *Coalition*, 2025 WL 2192986, *9–10, 39. The government does not address *Coalition* or its consequences in its briefing here.

1 | *12–18.

2 |       The Court agrees with the analyses presented in *Coalition* and *Make the Road* and adopts

3 | the reasoning of those cases here.

4 |       **B.      Parole**

5 |       ICE may choose to release a person on parole. The decision is discretionary and is made

6 | on a case-by-case basis. An immigrant who has been detained at the border, may be paroled for

7 | humanitarian reasons or due to it providing a significant public benefit (8 U.S.C. § 1182(d)(5)(A))

8 | or she may be conditionally released (8 U.S.C. § 1226(a))[7]. These are distinct procedures. A

9 | person on conditional parole is usually released on their own recognizance subject to certain

10 | conditions such as reporting requirements.[8] To be released on conditional parole, there must be a

11 | finding that the immigrant does not pose a risk of flight or danger to the community. *Ortega-*

12 | *Cervantes v. Gonzales*, 501 F.3d 1111, 1115 (9th Cir. 2007). One important difference between

13 | these types of parole is that conditional release does not provide a pathway for the immigrant to

14 | seek adjustment of status under 8 U.S.C. § 1255(a). *Id.* at 1119-20.

15 |       **C.      Parole Revocation**

16 |       In *Y-Z-H-L v Bostock*, 2025 WL 1898025, at *10–12 (D. Or. July 9, 2025), the court

17 | explained the parole process in immigration cases and noted that before parole may be revoked,

18 | the parolee must be given written notice of the impending revocation, which must include a

19 | cogent description of the reasons supporting the revocation decision. The court held:

20 |              Section 1182 . . . has a subsection titled "Temporary admission of
              nonimmigrants," which allows noncitizens, even those in required
21 |              detention, to be "paroled" into the United States. This provision, at
              issue in this case, states:
22 |

23 |                     The Secretary of Homeland Security may, except as

---

24 | [7] Respondents argue that "Until recently, the government interpreted Section 1226(a) to be an available detention authority for noncitizens [] placed directly in full removal proceedings under Section 1229a." (Doc. 11 at 9.)

25 | However, it is now Respondents' position "that this interpretation was incorrect, and that Section 1225 is the sole applicable immigration detention authority for all applicants for admission. *See [Jennings v. Rodriguez*, 583 U.S.

26 | 281, 297 (2018) ("Read most naturally, §§ 1225(b)(1) and (b)(2) thus mandate detention of applicants for admission until certain proceedings have concluded")." (*Id.*) This argument is discussed in greater detail below.

27 |

28 | [8] An immigrant cannot be released on conditional parole if they are subject to mandatory detention under § 1226(c). There is no suggestion that § 1226(c) applies in this case.

provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and **when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant                                    for admission to the United States.**

8 U.S.C. § 1182(d)(5)(A).

*Y-Z-H-L v Bostock*, 2025 WL 1898025, at *3 (emphasis added). *Y-Z-H-L* determined that under the Administrative Procedure Act, immigration parolees are entitled to determinations related to their parole revocations that are not arbitrary, capricious or an abuse of discretion. *Id*. at *10. An agency acts arbitrarily and capriciously by failing to make a reasoned determination or where the agency fails to "articulate[] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id*. Parole revocations in the context of the INA must occur on a case-by-case basis and may occur "when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled." *Id*. at *12 (quoting § 212.5(e)). Section 212.5(e) requires written notice of the termination of parole except where the immigrant has departed or when the specified period of parole has expired.

In considering *Y-Z-H-L* & § 212.5(e), other courts have found that the statute requires a case-by-case analysis as to the decision to revoke parole. In *Mata Velasquez v. Kurzdorfer*, No. 25-CV-493-LJV, 2025 WL 1953796, at *11 (W.D.N.Y. July 16, 2025), the Court held similarly, though in the context of humanitarian parole:

This Court agrees that both common sense and the words of the statute require parole revocation to be analyzed on a case-by-case basis and that a decision to revoke parole "must attend to the reasons an individual [noncitizen] received parole." *See id*. There is no indication in the record that the government conducted any such analysis here. On the contrary, the letter Mata Velasquez received

merely stated summarily that DHS had "revoked [his] parole." Docket Item 62-1 at 5. Thus, there is no indication that—as required by the statute and regulations—an official with authority made a determination specific to Mata Velasquez that either "the purpose for which [his] parole was authorized" has been "accomplish[ed]" or that "neither humanitarian reasons nor public benefit warrants [his] continued presence...in the United States." See 8 C.F.R. § 212.5(e)(2)(i). As a result, DHS's revocation of Mata Velasquez's parole violated his rights under the statute and regulations. *See Y-Z-L-H*, 2025 WL 1898025, at *13.

In *Pinchi v. Noem*, No. 5:25-CV-05632-PCP, ___ F. Supp. 3d ___, 2025 WL 2084921, at *3 (N.D. Cal. July 24, 2025), the Court reached a similar conclusion relying on the Due Process Clause. In *Pinchi,* the court held,

> . . . **even when ICE has the initial discretion to detain or release a noncitizen pending removal proceedings, after that individual is released from custody she has a protected liberty interest in remaining out of custody**. *See Romero v. Kaiser*, No. 22-cv-02508, 2022 WL 1443250, at *2 (N.D. Cal. May 6, 2022) ("[T]his Court joins other courts of this district facing facts similar to the present case and finds Petitioner raised serious questions going to the merits of his claim that due process requires a hearing before an IJ prior to re-detention."); *Jorge M. F. v. Wilkinson*, No. 21-cv-01434, 2021 WL 783561, at *2 (N.D. Cal. Mar. 1, 2021); *Ortiz Vargas v. Jennings*, No. 20-cv-5785, 2020 WL 5074312, at *3 (N.D. Cal. Aug. 23, 2020); *Ortega*, 415 F. Supp. 3d at 969 ("Just as people on preparole, parole, and probation status have a liberty interest, so too does [a noncitizen released from immigration detention] have a liberty interest in remaining out of custody on bond.").

*Id.* (emphasis added). Other courts, including this Court, have held similarly. *Doe v. Becerra*, No. 2:25-CV-00647-DJC-DMC, 2025 WL 691664, at *4 (E.D. Cal. Mar. 3, 2025); *see also Padilla v. U.S. Immigr. & Customs Enf't*, 704 F. Supp. 3d 1163, 1172 (W.D. Wash. 2023) ("The Supreme Court has consistently held that non-punitive detention violates the Constitution unless it is strictly limited, and, typically, accompanied by a prompt individualized hearing before a neutral decisionmaker to ensure that the imprisonment serves the government's legitimate goals.").[9]

---

[9] Respondent relies on cases about the due process rights of aliens in different contexts. (*See, e.g.*, Doc. 11 at 12 ("[N]oncitizens amenable to expedited removal cannot assert a protected property or liberty interest in additional procedures not provided by the statute. 8 U.S.C. § 1225. *See Dave v. Ashcroft*, 363 F.3d 649, 653 (7th Cir. 2004). Instead, those noncitizens — including Petitioner[s]— have "only those rights regarding admission that Congress has provided by statute." [*DHS v. ]Thuraissigiam*, 591 U.S. [103,] 140 [(2020)].")). As one thorough decision recently issued in the District of Arizona explained, *Thuraissigiam* is distinguishable:

> In *Thuraissigiam* the Supreme Court held that a petitioner who was stopped at the border did not have any

Finally, *Coalition* at *37 stayed on a nationwide basis DHS's January 23, 2025 memorandum, which authorized ICE officials to terminate or modify any parole program and to consider placing any immigrant amenable to expedited removal into that status. It also issued a nationwide stay of the February 18, 2025 ICE Directive, which directed ICE officials to consider placing parolees into expedited removal. *Id.*; *see also Make the Road.* 2025 WL 2494908, * 23. Notably, Petitioners were arrested *after* the stay issued and apparently pursuant to these policies. Even still, the government does not address the nationwide stay or *Coalition*.

### III.    MOTION TO SEVER FOR MISJOINDER

Respondents move, pursuant to Federal Rule of Civil Procedure 21, to sever the parties and require each Petitioner, other than the first named, to file separate petitions. (Doc. 10.)

Federal Rule of Civil Procedure 18 allows a party asserting a claim for relief to "join, as independent or alternative claims, as many claims as it has against an opposing party." Fed. R. Civ. P. 18(a). A plaintiff may also bring claims against more than one defendant if: (1) the claims arise "out of the same transaction, occurrence, or series of transactions or occurrences," and (2) there is a "question of law or fact common to all defendants." Fed. R. Civ. P. 20(a)(2). "The 'same transaction' requirement of Rule 20 refers to 'similarity in the factual background of a claim; claims that arise out of a systematic pattern of events' and have a 'very definite logical relationship.'" *Hubbard v. Hougland*, No. CIV S-09-0939 JAM GGH P, 2010 WL 1416691, at *7 (E.D. Cal. Apr. 5, 2010) (quoting *Bautista v. Los Angeles County*, 216 F.3d 837, 842–843 (9th Cir. 2000)). In addition, "the mere fact that all [of a plaintiff's] claims arise under the same general law does not necessarily establish a common question of law or fact." *Coughlin v. Rogers*, 130 F.3d 1348, 1351 (9th Cir. 1997)(finding severance appropriate where "Plaintiffs do not allege that their claims arise out of a systematic pattern of events and, therefore, arise from the

---

due process rights regarding admission into the United States. *Thuraissigiam*, 591 U.S. at 107. In contrast, the pending § 2241 petition does not challenge any determination regarding [petitioner's] admissibility into the United States, but instead involves a challenge to her detention pending the conclusion of her removal proceedings

*Rosado v. Figueroa*, No. CV 25-02157 PHX DLR (CDB), 2025 WL 2337099, at *15 (D. Ariz. Aug. 11, 2025), *report and recommendation adopted sub nom. Rocha Rosado v. Figueroa*, No. CV-25-02157-PHX-DLR (CDB), 2025 WL 2349133 (D. Ariz. Aug. 13, 2025).

1    same transaction or occurrence" and "do not allege a pattern or policy of delay in dealing with all

2    applications and/or petitions by the INS."). However, "even once [the Rule 20(a)] requirements

3    are met, a district court must examine whether permissive joinder would 'comport with the

4    principles of fundamental fairness' or would result in prejudice to either side." *Coleman v.*

5    *Quaker Oats Co.*, 232 F.3d 1271, 1296 (9th Cir. 2000) (citing *Desert Empire Bank v. Ins. Co. of*

6    *N. Am.*, 623 F.2d 1371, 1375 (9th Cir. 1980) (finding the district court did not abuse its discretion

7    when it severed certain plaintiff's claims without finding improper joinder)).

8         Under Rule 20(b), the district court may sever claims or parties to avoid prejudice. Fed. R.

9    Civ. P. 20(b). Courts have also exercised the discretion to sever where "[i]nstead of making the

10   resolution of [the] case more efficient . . . joinder would instead confuse and complicate the issues

11   for all parties involved." *Wynn v. National Broadcasting Co.*, 234 F. Supp. 2d 1067, 1088 (C.D.

12   Cal. 2002) (finding that even where Rule 20 requirements for joinder are satisfied, the Court may

13   exercise its discretion "to sever for at least two reasons: (1) to prevent jury confusion and judicial

14   inefficiency, and (2) to prevent unfair prejudice to the [defendants]").

15        In addition, "[o]n a motion or on its own, the court may at any time, on just terms, add or

16   drop a party" and "sever any claim against a party." Fed. R. Civ. P. 21. However, "[m]isjoinder of

17   parties is not a ground for dismissing an action." *Id*. The proper remedy for misjoinder is to sever

18   misjoined parties and dismiss claims against them, provided that "no substantial right will be

19   prejudiced by the severance." *Coughlin*, 130 F.3d at 1350.

20        Notably, Respondents do not contend that joinder of habeas petitions is impermissible.

21   They merely cite to distinguishable cases in which courts have declined to permit petitions to be

22   joined, such as where the petitioners were proceeding pro se. (*See* Doc. 10 at 1–2.) As Petitioners

23   point out (Doc. 12 at 3), it is not unprecedented for a district court to issue injunctive relief to

24   multiple immigration detainees joined into one habeas Petition. *See Ortuno v. Jennings*, No. 20-

25   CV-02064-MMC, 2020 WL 1701724, at *1 (N.D. Cal. Apr. 8, 2020). In addition, the Court

26   agrees with Petitioners that the allegations in this habeas case involve a "systemic pattern of

27   events" that is common to all Petitioners. Moreover, nothing in the record suggest joinder would

28   run afoul of "fundamental fairness" or would result in prejudice to either side. Here, to the

1    contrary, this case has efficiently brought the claims of six Petitioners before the Court.

2

3    **IV.        REQUEST FOR INJUNCTIVE RELIEF**

4        **A.        Jurisdiction**

5            **1.        Habeas Corpus**

6        Under 28 U.S.C. § 2241, the Court has the authority to determine a petition for writ of

7    habeas corpus in which the petitioner asserts they are being held in custody "in violation of the

8    Constitution or laws or treaties of the United States." "The essence of habeas corpus is an attack

9    by a person in custody upon the legality of that custody, and that the traditional function of the

10   writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973).

11       Petitioners seek their immediate release from custody, which they contend violates the

12   Constitution of the United States. (*See* Doc. 1 at 16.) Thus, they properly invoke the Court's

13   habeas jurisdiction.

14           **2.        Judicial Review under the INA**

15       The INA limits judicial review in many instances. Though 8 U.S.C § 1252(g), precludes

16   this Court from exercising jurisdiction over the executive's decision to "commence proceedings,

17   adjudicate cases, or execute removal orders against any alien," there are no removal orders at

18   issue here. Thus, Court has the authority to review the termination of Petitioners' paroles. *See*

19   *Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018) (holding that § 1252(g) precludes judicial

20   review only as to the three areas specifically outlined in the subsection); *see also Reno v.*

21   *American–Arab Anti–Discrimination Committee*, 525 U.S. 471, 482 (1999).

22       **D. Likelihood of Success on the Merits**

23       This first factor "is the most important" under *Winter*, and "is especially important when a

24   plaintiff alleges a constitutional violation and injury." *Baird v. Bonta*, 81 F.4th 1036, 1041 (9th

25   Cir. 2023). When an immigrant is placed into parole status after having been detained, a protected

26   liberty interest may arise. *Young v. Harper*, 520 U.S. 143, 147-149 (1997)[10]. The Due Process

27

28       [10] In *J.G.G.*, the Supreme Court re-affirmed that aliens are entitled to due process of law in deportation proceedings and must be given notice and an opportunity to be heard commensurate with the nature of the case. *Trump v. J. G. G.*, 604 U.S. ___, 145 S. Ct. 1003, 1006 (2025).

1    Clause may protect this liberty interest even where a statute allows the immigrant's arrest and

2    detention and does not provide for procedural protections. *Id.* (Due Process requires pre-

3    deprivation hearing before revocation of preparole); *Morrissey v. Brewer*, 408 U.S. 471, 482

4    (1972).

5        *Morrissey* observed that parole allows the parolee to enjoy the same activities as those

6    who have not been arrested and held in custody including, living at home, having a job, and

7    "be[ing] with family and friends and to form the other enduring attachments of normal life."

8    *Morrissey*, 408 U.S. at 482. "Though the [government] properly subjects [the parolee] to many

9    restrictions not applicable to other citizens," such as monitoring and seeking authorization to

10   work and travel, "his condition is very different from that of confinement in a prison." *Id.* "The

11   parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live

12   up to the parole conditions." *Id.* The revocation of parole undoubtedly "inflicts a grievous loss on

13   the parolee." *Id.* (quotations omitted). Therefore, a parolee possesses a protected liberty interest in

14   her "continued liberty." *Id.* at 481–84. As noted above, *Pinchi,* 2025 WL 2084921, at *3, agreed.

15       Respondents attempt to steamroll over this line of authority by insisting that detention is

16   "mandatory" under 8 U.S.C. § 1225(b) for these Petitioners. (Doc. 11 at 11.) This argument

17   requires some explanation. Respondents acknowledge that "[u]ntil recently, the government

18   interpreted Section 1226(a) to be an available detention authority for noncitizens [] placed

19   directly in full removal proceedings under Section 1229a." (Doc. 11 at 9.) However, it is now

20   Respondents' position "that this interpretation was incorrect, and that Section 1225 is the sole

21   applicable immigration detention authority for all applicants for admission. *See [Jennings v.*

22   *Rodriguez*, 583 U.S. 281, 297 (2018) ("Read most naturally, §§ 1225(b)(1) and (b)(2) thus

23   mandate detention of applicants for admission until certain proceedings have concluded")." (*Id*.)

24   Crucial to this argument as applied to this case is 8 U.S.C. 1225(b)(2), which provides:

25           Subject to [certain exceptions], in the case of an alien who is an
             applicant for admission, if the examining immigration officer
26           determines that an alien seeking admission is not clearly and
             beyond a doubt entitled to be admitted, the alien shall be detained
27           for a proceeding under section 1229a of this title.

28   This language references 1229, i.e., Section 240 removal proceedings, and indicates any

15

"applicant for admission" shall be detained while Section 240 proceedings are ongoing. Based on this interpretation, and the fact that bond hearings are unavailable under §§ 1225(b)(1) or (b)(2), it is the position of Respondents that Petitioners must be detained pending completion of their removal proceedings. (*See* Doc. 11 at 10.) This position was acknowledged by the IJ rulings in the three bond hearings described above. (*See, e.g.*, RA 0021.) Yet even assuming Respondents are correct[11] that § 1225(b) is the applicable detention authority for all "applicants for admission," Respondents fail to contend with the liberty interests created by the fact that the Petitioners in this case were released on recognizance *prior to the manifestation of this interpretation*.

Thus, the Court must evaluate the three-part test set forth in *Mathews v. Eldridge,* 424 U.S. 319, 334-335 (1976), to determine whether the procedures (or lack thereof) that have been applied to Petitioners are sufficient to protect the liberty interest at issue. *Pinchi*, 2025 WL 2084921 at *3.[12] In *Mathews*, the Court determined,

---

[11] Notwithstanding this assumption, the Court has serious doubts about the validity of Respondents' interpretation of the relationship between §§ 1225 and 1226 and, for that matter, their application of *Jennings* to these facts. Though *Jennings* addressed the right to detain immigrants under § 1225 who arrive at an official port of entry and those who are found "already present inside the country," it did not speak to the situation presented here where immigration officials determined that the petitioners did not pose a danger to the community or pose a flight risk and released them on their own recognizance and then, as to all except Yury, arrested them without any intervening change in circumstances.

"[O]ur immigration laws have long made a distinction between those aliens who have come to our shores seeking admission . . . and those who are within the United States after an entry, irrespective of its legality. In the latter instance the Court has recognized additional rights and privileges not extended to those in the former category who are merely 'on the threshold of initial entry.'" *Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958) (internal citation omitted). As *Rodriguez v. Bostock*, 779 F. Supp. 3d 1239, 1258 (W.D. Wash. 2025), explained, if Respondents are correct that § 1225's mandatory detention provisions apply to all noncitizens who have not been admitted, that interpretation "would render superfluous provisions of Section 1226 that apply to certain categories of inadmissible noncitizens. *See* § 1226(c)(1)(A), (D), (E)." In other words, "Section 1226(c)(1)(E)'s mandated detention for inadmissible noncitizens who are implicated in an enumerated crime, including those 'present in the United States without being admitted or paroled,' would be meaningless since 'all noncitizens who have not been admitted' would already be governed by 1225's mandatory detention authority. *See* § 1225(a)(1); § 1182(a)(6)(A)(i)." *Rodriguez*, 779 F. Supp. 3d at 1258. To underscore this point, as *Rodriguez* points out, "some of the exceptions in Section 1226(c) that would be rendered superfluous by the [argued] reading were enacted by Congress just months ago," in January 2025 when Congress passed the Laken Riley Act, Pub. L. No. 119-1, 139 Stat. 3 (2025). 779 F. Supp 3d at 1259; *see also Martinez v. Hyde*, No. CV 25-11613-BEM, ___ F. Supp. 3d ___, 2025 WL 2084238, at *8 (D. Mass. July 24, 2025) (pointing out "[t]he line historically drawn between these two sections, making sense of their text and the overall statutory scheme, is that section 1225 governs detention of non-citizens 'seeking admission into the country,' whereas section 1226 governs detention of non-citizens 'already in the country.'").

[12] Respondent argues (Doc. 11 at 11) that the Court should not apply Mathews, citing the Ninth Circuit's ruling in *Rodriguez Diaz*, 53 F.4th 1206, which noted that the Supreme Court "when confronted with constitutional challenges to immigration detention has not resolved them through express application of Mathews." Yet, after noting that other circuits have applied the *Mathews* test to immigration detention issues and the Ninth Circuit has applied *Mathews* in other immigration contexts, *Rodriguez Diaz* went on to "assume without deciding" that *Mathews* applied in the

> [O]ur prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

During their time on recognizance, all the Petitioners applied for and built lives outside detention, albeit under the terms of their parole. They therefore have substantial private interests in being out of custody, which would allow her them continue in these life activities. As other courts have done, the Court concludes that Respondents' interest in detaining Petitioners or re-detaining them without a hearing, is slight. As for all the Petitioners, there is no dispute that none have criminal records; all, save Yury, have abided by all conditions of their parole; and other than the still pending motions to dismiss in Marianela's and Mayra's Section 240 proceedings, there has been no change in any of their circumstances that would warrant a finding that any one of them is a flight risk or a danger to the community. The fact that Lorgia and Ammy have been afforded bond hearings does not move the needle. The results of those bond hearings demonstrate that a post-deprivation bond hearing will not address the due process concern, namely that Petitioners be afforded some explanation as to why the previous determination that they were not a flight risk or danger to the community has changed. Instead, as reflected in the IJ Order issued in Ammy's case, the IJs declined to exercise jurisdiction, finding she is subject to mandatory detention under § 1225. (RA 021.) Thus, the bond hearing did not in fact provide Ammy an opportunity to contest the existence, nature, or significance of the supervision violations. Though the Court has not been presented with it, the Court presumes that the IJs order denying bond to Lorgia would say much the same. Thus, the Court concludes that Marianela, Mayra, Lorgia, Ammy, and Marela have demonstrated a likelihood of success on the merits on their Due Process claim.

As for Yury, the analysis requires one additional step, but the result is the same. Assuming for purposes of this analysis that the asserted violations—missing one check-in and failing to provide an accurate address—are true, it does not necessarily follow that ICE could detain her

---

immigration context. *Id*. at 1207.

without any notice or opportunity to challenge the basis for her re-detention. At the bond hearing she was provided, the IJ declined to exercise jurisdiction, finding that Yury was subject to mandatory detention under § 1225(b)(2)(A). (RA 026.) However, the Court agrees that whether she may be continued to be detained is a question for the IJ who must determine the issue on its merits.

### E.  Irreparable Harm

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 247, 272 (1976)). Moreover, "[t]he Ninth Circuit has recognized 'irreparable harms imposed on anyone subject to immigration detention' including 'the economic burdens imposed on detainees and their families as a result of detention.'" *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017); *Leiva-Perez v. Holder*, 640 F.3d 962, 969-970 (9th Cir. 2011) (the inability to pursue a petition for review may constitute irreparable harm).[13] The Petitioners have established irreparable harm.

### F.  Balance of the Harms/Public Interest

Because the interest of the government is the interest of the public, the final two factors merge when the government is the opposing party.  *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Court agrees with the analysis of *Pinchi,* and finds it correctly addresses the situation here:

> "[T]he public has a strong interest in upholding procedural protections against unlawful detention, and the Ninth Circuit has recognized that the costs to the public of immigration detention are staggering." *Jorge M. F.*, 2021 WL 783561, at \*3 (cleaned up) (quoting *Ortiz Vargas*, 2020 WL 5074312, at \*4, and then quoting *Hernandez*, 872 F.3d at 996); see also *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) ("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution."). Without the requested injunctive relief, Petitioner-Plaintiff faces the

---

[13] The Court pauses to note that Ammy is the mother to a breastfeeding child. (Doc. 2 at 19, 24) As a result of her sudden withdrawal from her baby and the inability to feed, she suffered the painful condition of having her milk ducts clog. *Id*. There is no indication she was provided a breast pump or other assistance to maintain her milk supply. Once milk production is lost, a mother can no longer breastfeed her baby.

Similarly, Ammy is newly pregnant, after having suffered a miscarriage recently. She needs prenatal care to support the pregnancy. If she loses the baby due to improper medical care or nutrition, the stress caused by her incarceration or the conditions of her confinement, this will do her harm that cannot be rectified.

danger of significant health consequences and deprivation of her liberty. Yet the comparative harm potentially imposed on Respondents-Defendants is minimal—a mere short delay in detaining Petitioner-Plaintiff, should the government ultimately show that detention is intended and warranted. Moreover, a party "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Zepeda v. U.S. Immigr. & Nat. Serv.*, 753 F.2d 719, 727 (9th Cir. 1983).

This Court therefore joins a series of other district courts that have recently granted temporary restraining orders barring the government from detaining noncitizens who have been on longstanding release in their immigration proceedings, without first holding a pre-deprivation hearing before a neutral decisionmaker. *See, e.g., Diaz v. Kaiser*, No. 25-cv-05071, 2025 WL 1676854, at *2 (N.D. Cal. June 14, 2025); *Garcia v. Bondi*, No. 25-cv-05070, 2025 WL 1676855, at *3 (N.D. Cal. June 14, 2025). Although Petitioner filed her motion shortly after being detained, rather than immediately beforehand, the same reasoning applies to her situation. Her liberty interest is equally serious, the risk of erroneous deprivation is likewise high, and the government's interest in continuing to detain her without the required hearing is low. *See Doe v. Becerra*, No. 2:25-cv-00647-DJC-DMC, 2025 WL 691664, at *6 (E.D. Cal. Mar. 3, 2025) (granting a TRO as to an individual who had been detained over a month earlier).

*Pinchi*, at *3. In addition, there appears to be no dispute that there is no evidence that Petitioners, except for Yury Vasquez Perez poses a risk of flight or a danger to the community. For these reasons and those set forth in *Pinchi*, the Court concludes that the balance of the equities and public interest weigh in favor of Petitioners.

### G. Bond

"The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Court has "discretion as to the amount of security required, if any," and it "may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (citation modified). Because "the [Government] cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations," *Zepeda*, 753 F.2d at 727, the Court finds that no security is required here.

**H.**    **Parole Revocation hearing**

Petitioners request an order enjoining their re-detention without a pre-deprivation hearing where the government bears the burden of proof.[14] (*See* Doc. 3 at 12.) In *Rodriguez Diaz v. Garland*, 53 F.4th 1189 (9th Cir. 2022), the Ninth Circuit considered whether a noncitizen detained under § 1226(a) pending removal proceedings had a right to a second bond hearing where the government would have the burden to establish by clear and convincing evidence that his continued detention was justified. *Rodriguez Diaz* concluded that due process did not require that procedure, reasoning in part that:

> Nothing in this record suggests that placing the burden of proof on the government was constitutionally necessary to minimize the risk of error, much less that such burden shifting would be constitutionally necessary in all, most, or many cases. There is no reason to believe that, as a general proposition, the government will invariably have more evidence than the alien on most issues bearing on alleged lack of future dangerousness or flight risk.

*Id*. at 1212.

However, as the *Pinchi* court explained, *Rodriguez Diaz* did not address the question presented here:

> The Ninth Circuit did not hold in *Rodriguez Diaz* that noncitizens facing removal under section 1226(a) have no due process right to a pre-detention hearing. It held only that a noncitizen detained under section 1226(a) does not have a right to a second bond hearing when the only changed material condition since their first bond hearing is the duration of their detention. Because the question presented here was not presented in Rodriguez Diaz, the court had no opportunity to address it.

*Pinchi*, 2025 WL 2084921, at *4. *Pinchi* went on to discuss why the calculus changes for an individual who had been paroled from immigration custody after their initial detention:

> Even assuming arguendo that the post-detention bond hearing provided under section 1226(a) provides constitutionally sufficient process for those noncitizens who have never previously been detained and released by DHS, [Petitioner's] circumstance is different. Her release from ICE custody after her initial apprehension reflected a determination by the government that she was neither a flight risk nor a danger to the community, and [she] has a strong interest in remaining at liberty unless she no longer

---

[14] Alternatively, she requests that her re-detention be enjoined unless DHS obtains a further order from this Court. (Doc. 2 at 20.) The Court declines to order that alternative form of relief.

meets those criteria. The regulations authorizing ICE to release a noncitizen from custody require that the noncitizen "demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons" and that the noncitizen is "likely to appear for any future proceeding." 8 C.F.R. § 1236.1(c)(8). "Release [therefore] reflects a determination by the government that the noncitizen is not a danger to the community or a flight risk." *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1176 (N.D. Cal. 2017), aff'd sub nom. *Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018). [Petitioner] was apprehended by ICE officers when she crossed the border into the United States [ ]. ICE then released her on her own recognizance. As ICE was not authorized to release [her] if she was a danger to the community or a flight risk, the Court must infer from [her] release that ICE determined she was neither. [Her] release from ICE custody constituted an "implied promise" that her liberty would not be revoked unless she "failed to live up to the conditions of her release." *Morrissey*, 408 U.S. at 482. The regulatory framework makes clear that those conditions were that she remain neither a danger to the community nor a flight risk. [She] justifiably relied on the government's implied promise in obtaining employment, taking on financial responsibility for her family members, and developing community relationships. The more than two years that she has spent out of custody since ICE initially released her have only heightened her liberty interest in remaining out of detention. Accordingly, [her] private interest in retaining her liberty is significant.

*Pinchi*, 2025 WL 2084921, at *4

This reasoning contributed to the conclusion in *Pinchi* that a pre-deprivation hearing was required under *Mathews*. The court in *Pinchi* also placed the burden at any such hearing on the government to demonstrate to a neutral decisionmaker by clear and convincing evidence that re-detention is necessary to prevent danger to the community or flight. *Id*. at *7. Doing so is logical under the circumstances for the reasons articulated in *Pinchi*—namely that the immigrant's initial release reflected a determination by the government that the noncitizen is not a danger to the community or a flight risk. Since it is the government that initiated re-detention, it follows that the government should be required to bear the burden of providing a justification for the re-detention.[15]

## CONCLUSION AND ORDER

For the foregoing reasons, the Court **ORDERS:**

---

[15] The Court declines to grant the alternative relief of requiring a further order of this Court before the Petitioner may be re-detained.

1.    As to the Petitioners, except Yury Vasquez Perez, the Motion for Temporary Restraining Order (Doc. 3) is **GRANTED**.

2.    Petitioners, except Yury Vasquez Perez, **SHALL** be released **immediately** from Respondents' custody. DHS **SHALL NOT** impose any additional restrictions on them, such as electronic monitoring, unless that is determined to be necessary at a future pre-deprivation/custody hearing.

3.    As to Petitioners, except Yury Vasquez Perez, during the pendency of the temporary restraining order, Respondents **SHALL NOT** re-arrest or re-detain Petitioners absent compliance with constitutional protections, which include at a minimum, pre-deprivation notice describing the change of circumstances necessitating her arrest and detention, and a timely hearing. At any such hearing, the Government **SHALL** bear the burden of establishing, by clear and convincing evidence, that the Petitioner poses a danger to the community or a risk of flight, and the Petitioner **SHALL** be allowed to have counsel present.

4.    As to the Yury Vasquez Perez, the Motion for Temporary Restraining Order (Doc. 3) is **GRANTED IN PART. No later than Friday September 12, 2025**, Yury Vasquez Perez **SHALL** be provided a post-deprivation hearing at which an Immigration Judge **SHALL** determine whether the government has demonstrated by clear and convincing evidence that Yury Vasquez Perez poses a danger to the community or a risk of flight, and she **SHALL** be allowed to have counsel present. If she is released, Respondents **SHALL NOT** re-arrest or re-detain Yury Vasquez Perez absent compliance with constitutional protections, which include at a minimum, pre-deprivation notice describing the change of circumstances necessitating her arrest and detention, and a timely hearing. At any such hearing, the Government **SHALL** bear the burden of establishing, by clear and convincing evidence, that the Petitioner poses a danger to the community or a risk of flight, and the Petitioner **SHALL** be allowed to have counsel present

5.    Respondents shall file, if at all, their brief related to the preliminary injunction **no later than September 10, 2025**. If they choose to file a brief, Petitioners may file a reply brief **no later than September 12, 2025**.

6.    **No later than September 10, 2025**, Respondents **SHALL** file a status report

regarding the outcome of the post-deprivation hearing as to Yury Vasquez Perez and include a copy of the IJ's determination.

       7.      The Court sets a hearing on the preliminary injunction **on September 18, 2025 at 9 a.m. via Zoom**. The Court will provide the Zoom details as the hearing date approaches. Petitioners have waived a hearing on the preliminary injunction. If Respondents waive the hearing, the Court will vacate it.

IT IS SO ORDERED.

     Dated:   **September 5, 2025**

UNITED STATES DISTRICT JUDGE